

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| |
|---|
| IN THE MATTER OF THE SEARCH OF ONE IPHONE, WITH A BLUE AND BLACK CASE, DESCRIBED MORE FULLY IN ATTACHMENT A. |

Case No. 3:23-SW-116

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Michael K. Termyn, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one iPhone, black in color, having one rear-facing camera, one rear-facing flash, and one rear-facing microphone held within a blue and black case (the "Target Device"), more fully described in Attachment A—which is currently located at the Federal Bureau of Investigation (FBI) Richmond office located at 1970 E Parham Road, Richmond, Virginia, 23228—and the extraction from that property of electronically stored information, described in Attachment B, which is incorporated by reference.

2. I am a Special Agent (SA) with the FBI and have been so employed since March 2008. I am also the coordinator of the Richmond Area Violent Enterprise (RAVE) taskforce and have been for approximately eight years. RAVE is an FBI-led task force that works with local law enforcement to investigate violent criminal enterprises in the metro-Richmond area. I have been assigned to the Richmond Field Office since August 2008, working primarily on violent crime matters, to include aggravated assaults, commercial robberies, bank robberies, violent

1

criminal enterprises (gangs), fugitives, drug trafficking, firearm trafficking, kidnappings, and homicides. In conducting these investigations, I have used a variety of investigative techniques and resources, which include, but are not limited to, conducting physical and electronic surveillance, obtaining and monitoring court-authorized wiretaps, managing the use of cooperating sources, informants, and witnesses, and executing federal search and arrest warrants. Pursuant to these investigations, I have authored and executed criminal search warrants on electronic devices, including traditional cellular phones, smart phones, computers, and other forms of digital storage media. Through these investigations, training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by violent offenders to conduct their illegal activities, to include their communication methods.

3.  Specifically, as a part of firearms investigations, I have interviewed informants and cooperating witnesses, including federally prohibited persons who have possessed firearms; conducted physical surveillance; conducted consensual monitoring and recording of telephonic and non-telephonic communications; and obtained and executed search warrants that have led to seizures of narcotics, firearms, and other contraband. Based on my training, knowledge, and experience, I know that illegal firearms possessors and traffickers utilize mobile devices to maintain contact with their customers, suppliers and associates; maintain contact lists and communication applications ("apps"); plan and maintain information related to travel; access and store financial information and conduct banking activities; maintain calendars and reminders; and take and store pictures of themselves, their associates, money, firearms and other indicia of illegal activities. Based upon these investigations, I also know that individuals often use internet commerce to purchase firearms and firearms related devices, to include machinegun conversion

devices (commonly referred to as a "Glock Switch" or "Switch"). I have been involved in investigations involving the possession of machinegun conversion devices, and within the last three months I have personally observed the firearms instructor with the Richmond Police Department (RPD) install and fire multiple varieties of switches.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials and/or witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C § 922(o) (possession of a machinegun) have been committed by Gerald TAYLOR (BM, DOB: 03/XX/2002), and that a search of the Target Device, described in Attachment A, may contain evidence of these crimes, as described in Attachment B.

6. The Target Device is currently in the lawful possession of the FBI Richmond office located at 1970 E Parham Road, Richmond, Virginia, 23228. The Target Device was seized following the arrest of TAYLOR on May 24, 2023. I know that the Target Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Device first came into the possession of FBI.

7. The applied-for warrant would authorize the forensic examination of the Target Device for the purpose of identifying electronically stored data particularly described in Attachment B.

3

## PROBABLE CAUSE

8.      In December 2022, TAYLOR was arrested by detectives with RPD's Special Violence Interdiction Unit (SVIU) for possession of a concealed firearm and possession of a machinegun (specifically, a machinegun conversion device affixed to a firearm). These charges were taken under advisement in Richmond City Circuit Court.

9.      I know, from training and experience, and from conversations with other law enforcement officers, that a machinegun conversion device (commonly referred to as a "Glock switch" or "switch"), alters a semi-automatic firearm to be capable of firing fully automatic; meaning multiple rounds are expelled by a single trigger pull.

10.     I also know, from training and experience and from conversations with other members of law enforcement, that a machinegun is a firearm under the National Firearms Act (NFA), 26 U.S.C. § 5845(a). A machinegun is defined, in pertinent part, as "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). A machinegun conversion device is a part, or combination of parts, designed and intended for use in converting a semiautomatic Glock-style pistol into a machinegun; therefore, it by itself, is a "machinegun."

11.     About five months after TAYLOR's December arrest, on May 24, 2023, SVIU detectives were conducting surveillance on the 3400 block of Walmsley Boulevard in Richmond, VA, in an effort to locate a wanted individual and investigate a recent robbery. Part of that surveillance involved viewing public social media accounts for individuals SVIU detectives knew to be associated with 3400 Walmsley.

12. While conducting surveillance, SVIU detectives observed TAYLOR go "Live[1]" from social media Instagram account "dreskino1." The detective who initially viewed the Live had personal knowledge of TAYLOR, including from TAYLOR's arrest in December 2022, and had previously seen TAYLOR post and stream videos on Instagram with the username "dreskino1."

13. Within minutes of starting the Live, TAYLOR displayed a semi-automatic handgun with a tan grip and a black slide, which appeared to be altered with a machinegun conversion device, multiple times.



*Screenshots from TAYLOR'S Live on May 24, 2023, showing the black and tan firearm and affixed machinegun conversion device.*

---

[1] Instagram Live allows a user to stream a video in real-time. Other users may join the livestream.

14. During the Live, TAYLOR showed himself and his face numerous times. TAYLOR wore a black t-shirt, a black beanie, and what appeared to be a firearms holster. He also showed himself tucking the firearm into the front of his pants. Also during the Live, TAYLOR filmed himself with several other individuals, including the wanted individual that SVIU detectives had been attempting to locate.



*TAYLOR on May 24, 2023, on Live.*

15. Based on familiarity with the area, and on the exterior of the building shown in the Live, Detectives identified TAYLOR's location in the video as the Woodland Crossing Apartment Complex located in the 3400 block of Walmsley Boulevard in Richmond, VA, in the Eastern District of Virginia.

16. Within approximately 20 minutes of the Live ending, SVIU detectives and officers from RPD's 2nd Precinct Focus Mission Team (FMT) responded to the Woodland Crossings Apartment complex to locate TAYLOR. Officers found TAYLOR in an exterior staircase of the apartment building. TAYLOR tried to run up the staircase when officers pulled up in the parking lot but was detained and taken into custody. TAYLOR was wearing the same clothing he had been wearing on the Live, including the firearm holster.

17. When officers detained TAYLOR, they recovered a firearm that consisted of a tan Polymer 80 grip, a black Glock-style slide, and a machinegun conversion device affixed to the rear plate of the firearm. The firearm was recovered from TAYLOR'S pants, where he had tucked it during the Live. The firearm was loaded with a round in the chamber and the magazine was loaded as well. The firearm matched the depiction of the firearm displayed by TAYLOR that day on Live. The Target Device was also recovered from TAYLOR's person during the arrest.

18. FBI RAVE Task Force Officer (TFO) Kiniry and SVIU Detective Wilson interviewed TAYLOR while enroute to Richmond City Justice Center. TAYLOR was seated in front seat of TFO Kiniry's unmarked vehicle and was advised of his *Miranda* rights by Detective Wilson, who was in the backseat. TAYLOR acknowledged his *Miranda* rights.

19. TAYLOR requested to call his mother, so TFO Kiniry called TAYLOR'S mother on a number provided by TAYLOR. While on the phone, and in the presence of Detective Wilson and TFO Kiniry, TAYLOR stated, "there was a switch on the gun they got off me." When the call concluded, TFO Kiniry asked TAYLOR if he knows that a "switch" makes a semi-automatic firearm fully automatic, to which TAYLOR replied, "Yea."

## USE OF CELLULAR PHONES FOR CRIMINAL ACTIVITY

20. Based on my training and experience, I know that cellular telephones, like the Target Device, are important in a criminal investigation of illegal possession of firearms. This is particularly true in cases like this, where a firearm was modified with an illegal machinegun conversion device. In particular, I know that individuals who illegally possess and/or distribute firearms often:

   a. Use cellular telephones to communicate with weapons suppliers, facilitators, and customers in connection with their ongoing illicit activities, including communication by live conversations, voice messages, text messages, emails, and similar communication methods all conducted via the cellular telephones that often have internet capabilities;

   b. Use cellular telephones to maintain records, contact information, notes, ledgers, and other records relating to the transportation, ordering, sale, and distribution of firearms, even though such documents may be in code. That the aforementioned books, records, notes, ledgers, etc., are commonly maintained where illegal firearm possessors/traffickers have ready access to them, including but not limited to their cellular telephones;

   c. Use communication applications ("apps") to contact associates, dealers, and/or customers;

   d. Commonly maintain names, addresses and telephone numbers in their cellular telephones for their associates, even if said items may be in code, and that these

        types of records are sometimes maintained in computers or other electronic data storage devices; and

   e.  Frequently use their cellular telephones to take, cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and/or their firearms, and usually maintain these photographs and/or videos on their cellular telephone.

21.    I know, from training and experience, that individuals involved in the illegal possession and/or distribution of firearms will use cell phones, like the Target Device, to communicate with potential customers or sellers through various social media platforms such as Facebook, Instagram, and Snapchat and set up transactions via phone calls and text messages. Individuals who utilize various social media platforms, to include Facebook, Twitter, and Instagram, among others, also often post pictures with the fruits of the criminal exploits, specifically, individuals often post pictures of themselves and other with illegally obtained firearms. Furthermore, these individuals often utilize cell phones to gain access to various social media platforms.

22.    I also know that individuals who illegally possess firearms, including machineguns, often take pictures and videos of themselves and others with firearms. These pictures are frequently taken with cell phones and stored on cellular phones (like the Target Device), computers, tablets, and other electronic storage devices. These pictures and videos are also frequently stored and/or posted on the public and private features of various social media platforms, to include Facebook, Twitter, and Instagram, among others. In this instance, TAYLOR utilized Instagram to stream a Live of himself possessing the Glock-style pistol outfitted with a machinegun conversion device.

23. I also know that individuals who illegally possess firearms often possess other items commonly used or acquired in connection with the possession of firearms, like a machinegun conversion device. Some of these items include, but are not limited to, machinegun conversion devices, other firearms, firearm parts, ammunition, firearm receipts, firearms brochures or owner's manuals, records of sale or acquisition of firearms, firearms magazines, and holsters. These records can be physical and/or digital in nature and stored on electronic storage devices.

24. I am also familiar with methods employed by criminals to attempt to thwart any investigation of their criminal activity. These tactics, employed in part to evade law enforcement, include their criminal use of and association with: multiple residences, multiple cellular phones, counter surveillance, smuggling schemes, false or fictitious identities, coded communications and conversations and the use of firearms to ensure facilitation of the illegal activity. I know it is common for individuals who are engaged in the illegal possession and/or distribution of firearms to keep multiple phones or to change phones in order to evade detection by law enforcement.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

      miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer connected to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  e. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.    Based on my training, experience, and research, I know the Target Device to have capabilities that allows it to: serve as a wireless telephone, digital camera, portable music/media player, connect to the internet, send and receive emails, and/or send and receive text messages. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of illegal firearm possession/trafficking crimes as described herein, but also may provide forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be found on the Target Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process.

13

        Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Device to human inspection in order to determine whether it is evidence described by the warrant.

30.  *Manner of execution.* Because this warrant seeks only permission to examine the Target Device that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31.     Based on the foregoing, there is probable cause to believe that the Target Device, as described in Attachment A, is likely to contain evidence, as described in Attachment B, of violations of Title 18 U.S.C § 922(o) (possession of a machinegun) committed by TAYLOR.

Respectfully submitted,

Michael K. Termyn
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

/s/ ALS
HON. SUMMER L. SPEIGHT
United States Magistrate Judge
Eastern District of Virginia

Date: June 29, 2023

15

## ATTACHMENT A

1. The property to be searched (the Target Device) is: one iPhone, black in color, having one rear-facing camera, one rear-facing flash, and one rear-facing microphone held within a blue and black case, model: A1660, FCC ID: BCH-E3085A, IC: 579C-E3085A.

2. The Target Device is currently held at the Federal Bureau of Investigation (FBI) Richmond office located at 1970 E Parham Road, Richmond, Virginia, 23228.

3. This warrant authorizes the forensic examination of the Target Device for the purpose of identifying the electronically stored information described in Attachment B, which is incorporated by reference.



## ATTACHMENT B

1. All records in the Target Device and/or its previously extracted contents, described in Attachment A, which is incorporated by reference herein, that relate to violations of Title 18 U.S.C § 922(o) (possession of a machinegun), including:

   a. Notes, ledgers, messages, and similar records relating to the transportation, ordering, purchasing, and distribution of firearms;

   b. Address books, phone books, applications ("Apps"), and similar records reflecting names, addresses, telephone numbers and other contact or identification data of customers and suppliers of firearms;

   c. Applications and records relating to firearm trafficking proceeds and expenditures of money and wealth, including bank records, deposit receipts, investments and cryptocurrency;

   d. Calendars, applications, and other records of meetings, locations, schedules, and interstate and foreign travel;

   e. Digital photographs, videos, or audio recordings of TAYLOR and/or his confederates, assets, expenditure of proceeds gained through the illegal possession/distribution of firearms, and specific locations documented by the cellular device;

   f. Digital photographs, videos, or audio recordings of TAYLOR and/or his confederates and firearms;

   g. Stored communications, including text messages, MMS messages, voicemails, application communications, and social media communications;

   h. Any subscriber or owner information for the cellular telephones; and

   i. Any cellular telephone records, and telephone books or lists, or receipts relating to the acquisition and purchase of cellular telephones, or minutes purchased or applied to cellular telephones.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or

stored, including any form of devices or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.  Evidence of user attribution showing who used or owned the Target Device at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, browsing history and location history.